UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 17-22925-CIV-MORENO

3630 INVESTMENT CORP., *et al.*,

        Plaintiffs,

vs.

MIAMI-DADE COUNTY,

        Defendant.
_____/

## ORDER DENYING MOTION TO DISMISS

I. **Background**

This case arises out of a land-use dispute between Plaintiffs 3630 Investment Corp. and 5th Street Terminal, Inc. and Defendant Miami-Dade County. The Second Amended Complaint alleges the following: Plaintiff 3630 owns property located at 3630 and 3660 N.W. North River Drive, Miami, FL 33142. Within the property is a boat basin wherein Plaintiff 3630 owns the basin bottom and Plaintiff 5th Street Terminal Inc. leases the property from Plaintiff 3630. The County acquired an easement in 1962, from Plaintiffs' predecessor-in-interest, that permits it to operate a storm water drainage pipe that empties into Plaintiffs' waterway, with an eventual connection to the Miami River. The Easement explicitly includes the right to discharge water across the boat basin and into the Miami River, a navigable waterway.

Plaintiffs allege that the storm water drainage system does not include a method to prevent sediment from entering the system and depositing onto Plaintiffs' property. Thus, Plaintiffs allege that the sediment has accumulated in the basin and resulted in the floor becoming substantially shallower. In or about 2012, this reduction in depth allegedly began to

interfere with the use of the basin, including the type and number of vessels that could be berthed. However, Plaintiffs allege that the source and ownership of the sediment and outfall were not discovered until 2014.

The Second Amended Complaint includes five counts: (I) inverse condemnation under Article X, section 6 of the Florida Constitution; (II) inverse condemnation under the Fifth Amendment to the United States Constitution; (III) violations of the Clean Water Act; (IV) violations of sections 376.302 and 403.161 of the Florida Statutes; and (V) negligence. The County moves to dismiss the Second Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for four reasons. First, Plaintiffs' claims are barred by the statutes of limitation. Second, Plaintiffs were not the owners of the property at the time the alleged injury accrued, and they therefore lack standing to challenge any alleged taking. Third, the negligence claim (Count V) is untimely. Fourth, Plaintiffs fail to: (a) demonstrate an action of the County is responsible for the damages claim or (b) to identify any specific pollutants under state or federal law. For the following reasons, the County's Motion is denied.

II. **Legal Standard**

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986). To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Detailed factual allegations are not required, but a pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action."

2

*Twombly*, 550 U.S. at 555; *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004) ("To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims."). In short, the complaint must not merely allege misconduct, but must demonstrate that the pleader is "entitled to relief." *Iqbal*, 556 U.S. at 677-78.

III. **Discussion of Each Issue w/ Recommendation**

    A. **Standing**

        1. **Inverse Condemnation (Counts I and II)**

The County argues that Plaintiffs lack standing to assert inverse condemnation claims under the United States and Florida Constitutions. *See* U.S. Const. amend. V. ("[N]or shall private property be taken for public use, without just compensation); Fla. Const. art. X, § 6 ("No private property shall be taken except for a public purpose and with full compensation thereof paid to each owner."). The essence of the County's argument is that Plaintiff 3630's predecessor-in-title, Watkins Marine Co., Inc., is the proper party to bring this suit because Plaintiff 3630 did not acquire the property until 2004—forty-two years after the drainage system was acquired and put into operation. The County also claims that Plaintiff 3630's failure to allege that the system's operation has changed materially since it was installed should result in dismissal for lack of standing, because Plaintiff 3630 should have had notice of the sediment at the time it purchased the basin in 2004. Plaintiffs counter that their purchase date is immaterial because they were unaware the sediment was accumulating until 2012 when it interfered with vessel mooring in the basin. *See* D.E. 37 ¶ 7.

The question, then, is whether the takings claims accrued when the drainage system began operating in 1962 as the County posits, or at some point between 2012 and 2014 when

certain vessels could no longer access the marina, and Plaintiffs became aware the County was responsible for the sedimentary deposit. "In general, a takings claim accrues when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (internal quotation and citation omitted). The key date for accrual purposes is the date that Plaintiffs' land had been "clearly and permanently taken." *Id.* In cases in which the government's taking of property occurs through a gradual physical process—like a storm water outfall pipe releasing sediment into a boat basin—determining the exact moment a takings claim accrues is more difficult. This type of taking is generally referred to as an "environmental taking." *See id.*

Plaintiffs rely on the "stabilization doctrine" to argue that the taking had not occurred until 2014 when they became aware of the sediment's source. The "stabilization doctrine [] does not permit a claimant to delay bringing suit until any possibility of further damage has been removed." *Mildenberger v. United States*, 643 F.3d 938, 946 (Fed. Cir. 2011). "[T]he touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." *Boling*, 220 F.3d at 1373. In this case, Plaintiffs allege that in 2012, "the reduction in depth began to interfere with the use of the boat basin, reducing the type and number of vessels that can safely be berthed." D.E. 37 ¶ 7. But it was not until 2014 when Plaintiffs determined "the source and ownership of the sediment and outfall." *Id.*

Plaintiffs allege an environmental taking because the County's storm water outfall pipe releases sediment, gradually, that settles on the basin bottom, and ultimately affects the types of vessels that can dock in the marina. In *United States v. Dickinson*, the Supreme Court grappled with the issue of a taking by a gradual physical process, where Congress authorized the

4

construction of a dam that raised a river's water level and permanently flooded the plaintiff's land. 331 U.S. 745, 747 (1947). The government argued that the plaintiff's claims were time-barred, under the Tucker Act, because the statute of limitation began to run when the plaintiff's property was partially submerged for the first time—a date on which the plaintiff had yet to purchase the property. The Court rejected the government's contention that the takings claim accrued immediately upon the first inundation of the property, because at that time, the frequency and permanency of the flooding was uncertain. *Id.* at 749. Therefore, the Court held that the claim's accrual was delayed until the situation had "stabilized," such that the "consequences of the inundation ha[d] so manifested themselves that a final account may be struck." *Id.*

Here, Plaintiffs have standing because their takings claims allegedly accrued at some point between 2012 and 2014—while Plaintiff 3630 owned the basin bottom—when the consequences of the sedimentary deposit had manifested itself in a manner that interfered with vessel mooring in the marina, and Plaintiffs became aware the County was responsible for the deposit. Adopting the County's position that the accrual of the claims occurred sometime after 1962—when the sediment became permanent—would require this Court to disregard the plain language of the Supreme Court's decision in *Dickinson* and make a factual determination at the motion to dismiss stage. *See id.* at 748 ("The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die."). In fact, the Supreme Court rejected an argument similar to the County's in *Dickinson*, where the government argued that the taking occurred when the property was partially submerged for the first time.

5

The Court recognizes that in *United States v. Dow*, the Supreme Court clarified the stabilization doctrine, stating that "[t]he expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated for public use." 357 U.S. 17, 27 (1958). The Court is cognizant that this is not a Tucker Act case, but the Court remains unpersuaded that the Supreme Court's overarching concern for fairness under the Fifth Amendment, is inapplicable under a similar set of facts.

At this stage of the litigation, where the Court must accept the facts pleaded in the Second Amended Complaint as true and construe them in the light most favorable to Plaintiffs, fairness dictates that the alleged taking occurred sometime between 2012 and 2014 when the sediment began to interfere with the marina's use, and Plaintiffs were made aware the County was responsible, thereby effectuating a permanent taking. *See Boling*, 220 F.3d at 1371 ("[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined."). The County relies heavily on *Dep't of Transp. v. Burnette*, where the court—applying Article X, section 6(a) of the Florida Constitution—explained that an inverse condemnation claim accrues "[w]hen the government interferes with a person's right to possession and enjoyment of his property to such an extent so as to create a 'taking' in the constitutional sense," and "a right to compensation vests in the person owning the property at the time of such interference." 384 So. 2d 916, 920 (Fla. 1st DCA 1980). The court also noted that the right to compensation "has the status of property, is personal to the owner, and does not run with the land if she should subsequently transfer it without an assignment of such right." *Id.*

(quoting *Brooks Inv. Co. v. City of Bloomington*, 305 Minn. 305, 315-16, 232 N.W.2d 911, 918 (1975)).

*Burnette* concerned a claim for inverse condemnation under the Florida Constitution based on a diversion of drainage onto the plaintiff's property. *Id.* Florida's First District Court of Appeal determined that the government was responsible in tort for impacts to the property, *id.* at 922, but that the impacts did not amount to an uncompensated taking because the plaintiff did not own the property until after the drainage system had been completed and in operation, *id.* at 920-21. The court found it significant that the plaintiff

> Assembled the [first] tract eight years after the Department began the construction which [plaintiff] says effected a taking, and some five years after that construction was completed. [Plaintiff] made no investigation of drainage patterns before buying the [second] tract or before accepting title to the [third] tract in satisfaction of a judgment.

*Id.* at 919. Thus, "[plaintiff], the subsequent purchaser and grantee, has no claim in inverse condemnation without assignments of his predecessors' claims." *Id.* at 920. Quoting the Minnesota Supreme Court, the *Burnette* court articulated the rationale for this limitation as follows:

> If the rule were otherwise, the original owner of damaged property would suffer a loss and the purchaser of that property would receive a windfall. Presumably, the purchaser will pay the seller only for the real property interest that the seller possesses at the time of the sale and can transfer.

The County's argument under *Burnette* is well-taken, but at this stage, viewing the allegations in the Second Amended Complaint in the light most favorable to Plaintiffs, the environmental taking may not have stabilized until some time between 2012 and 2014. Notwithstanding that, the Court questions whether Plaintiffs were entirely oblivious to this

7

environmental phenomenon. In fact, by their own admission, Plaintiffs agree that their predecessor-in-title dredged the channel in 1989 because of the sedimentary deposit. *See* D.E. 37 ¶ 7. However, the Court will leave that for another day. For now, the Court is weary to make a factual determination at this stage. Thus, Plaintiffs have standing because the taking, as alleged, may have occurred between 2012 and 2014 when title to the basin belonged to Plaintiff 3630, and the sediment began to interfere with vessel mooring in the marina. The Court will re-visit the date of the claim's accrual with the benefit of a full record.

### 2. Florida Statute 403.161 (Count IV)

Next, the County argues that Plaintiffs lack standing to assert a claim under Florida Statute 403.161 because it does not contain a private right of action, but rather vests only the state with a civil cause of action. Section 403.141 makes clear that a violator "is liable to the state for any damage caused and for civil penalties as provided in § 403.141." Section 403.141(1) states that "[w]hoever commits a violation specified in s. 403.161(1) is liable to the state . . . Nothing herein shall give the department the right to bring an action on behalf of any private person." Further, "it seems clear from a plain and ordinary construction of section 403.141(1) that this particular provision merely creates the civil cause of action in favor of the state and subjects a section 403.161(1) violator to liability in favor of the state for damages, penalties, costs and expenses." *State v. Gen. Dev. Corp.*, 448 So. 2d 1074, 1081 (Fla. 2d DCA 1984). Count IV, however, seeks relief under sections 376.302 and 403.161. Section 376.313 provides a civil cause of action to any person for violations of sections 376.30-376.317 "for all damages resulting from a discharge or other condition of pollution covered by [sections] 376.30-376.317." Thus, because Plaintiffs allege a violation of section 376.302, Plaintiffs may properly seek relief under section 376.313. However, any relief sought pursuant to chapter 403 is foreclosed, because

it does not create a private right of action, and instead vests that authority with the state. Accordingly, the Motion is denied on that basis.

### B. Statutes of Limitation

#### 1. Inverse Condemnation (Counts I and II)

The County claims that the federal and state inverse condemnation claims are barred by the statutes of limitation. The County relies on *John R. Sand & Gavel Co. v. United States* for the proposition that an inverse condemnation claim under federal law has a six-year statute of limitation. 457 F.3d 1345 (Fed. Cir. 2006). The Federal Circuit in *Gavel Co.* applied the Tucker Act, 28 U.S.C. § 1491(a)(1), which provides the Court of Federal Claims with jurisdiction over takings claims brought ***against the United States***. (Emphasis added). Those claims are subject to a six-year statute of limitation. *See* 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). Thus, the six-year statute of limitation described in *Gavel Co.* is inapplicable here because the United States is not a party to this suit. The parties have not provided, and the Court has not found, any authority to support a statute of limitation in a takings claim based on either the Fifth or Fourteenth Amendments[1] to the United States Constitution. Even assuming *arguendo* that a takings claim had a six-year statute of limitation, Plaintiffs claims would not be barred because, viewed in the light most favorable to them, the taking, as alleged, may have occurred sometime between 2012 and 2014, and this suit was filed in 2017, within the six-year time limit.

---

[1] In *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 122 (1978), the United States Supreme Court stated in passing that the Fifth Amendment Takings Clause is "of course . . . applicable to the States through the Fourteenth Amendment."

9

In contrast, an inverse condemnation claim under Florida law is subject to a four-year statute of limitation. *Wise v. City of Lauderhill*, No. 15-60686-CIV, 2016 WL 3747605, at *3 (S.D. Fla. July 13, 2016); *see also New Testament Baptist Church Inc. of Miami v. State, Dep't. of Transp.*, 993 So. 2d 112, 113 (Fla. 4th DCA 2008) (citing § 95.11(3)(p), Fla. Stat.). Plaintiffs allege that in 2012, the reduction in the basin's depth began to interfere with its use, but Plaintiffs did not determine the source and ownership of the sediment until 2014. Stabilization occurs, and thus a takings claim accrues, once "the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Boling*, 220 F.3d at 1372. As described *supra*, the point at which a permanent taking may have occurred, was sometime between 2012 and 2014. It follows, then, that Plaintiffs' inverse condemnation claim under the Florida Constitution should not be dismissed, because this suit was brought in 2017, within the four-year time period if the claim accrued in the latter half of the two-year (2012-2014) window. Accordingly, because the Court is weary to make a factual determination, at this stage, when the takings claim accrued, the County's motion is denied as to the inverse condemnation claim under the Florida Constitution (Count I) and the claim under the United States Constitution (Count II).

### C. Failure to State a Claim

#### 1. Inverse Condemnation (Counts I and II)

The County argues that Counts I and II should be dismissed because Plaintiffs have failed to state a proper inverse condemnation claim under the United States and Florida Constitutions. To state a federal claim for inverse condemnation, a plaintiff must allege: "(1) a relevant property interest and (2) a government action that resulted in a taking." *Hansen v. United States*, 65 Fed. Cl. 76, 95 (2005). Additionally, a claim alleging a physical taking requires a physical

occupation of property. *Applegate v. United States*, 35 Fed. Cl. 406, 414 (1996). To state a Florida claim for inverse condemnation by physical occupation, a plaintiff must allege (1) property; (2) that has been taken; (3) for a public purpose; (4) without full compensation. Art. X, § 6(a), Fla. Const.

The County suggests that Plaintiffs have not alleged actual conduct by the government because they have not identified the County as the owner of the sediment. The Court disagrees. Plaintiffs have met their burden of alleging a plausible entitlement to relief because they allege that the County's easement includes the right to discharge water across Plaintiff 3630's boat basin, and the basin has been filled with sediment by way of the drainage system that the County operates as a benefit of the easement.

Next, the County argues that the flow of sediment through the storm water drainage system is a naturally occurring event that cannot be attributed to the government, and therefore cannot be a taking. The County likens this to the tide carrying sand to and from a beach. While the County may not control the sediment's existence, the County presumably may be able to control the amount, if any, that is deposited onto Plaintiffs' property through the storm water outfall pipe. But for the County's easement that permits the use of the storm water drainage system, the sedimentary deposit may not have occurred, or if it did occur, may have been exacerbated by the drainage system. *See Banks v. United States*, 314 F.3d 1304 (Fed. Cir. 2003) (finding that claims were not time-barred where government-built jetties exacerbated the gradual erosion of shoreline). Thus, Plaintiffs' allegations, viewed in the light most favorable to them, plausibly allege that the County's actions constituted a taking.

Finally, the County relies on *Woods Knoll, LLC v. City of Lincoln, Ala.* to argue that Plaintiffs have not adequately pleaded causation—*i.e.*, that the alleged interference with their property rights was caused by an action of the government. 548 F. App'x 577 (11th Cir. 2013). In *Woods Knoll*, the court held that the plaintiff, after losing at trial, could not adequately establish that the city's actions caused the flooding damage to the plaintiff's property because the flooding resulted from six sources. *Id.* at 580. The County suggests a host of reasons why the basin has become shallower, including the Plaintiffs' own negligence in failing to perform routine maintenance dredging. Plaintiffs need not exclude every reasonable causal alternative, as the County maintains. At the motion to dismiss stage, all well-pleaded allegations are taken as true, and Plaintiffs need only allege sufficient facts that plausibly raise an entitlement to relief. Here, Plaintiffs have met that burden as they have adequately alleged that the basin has become shallower as a result of the sediment deposited by the storm water drainage system owned by the County. Accordingly, the County's motion is denied on that basis.

### 2. Clean Water Act (Count III) and Section 376.302 (Count IV)

Next, the County argues that the Second Amended Complaint does not sufficiently allege the existence of a pollutant for purposes of the Clean Water Act or Florida Statute 376.302. Plaintiffs, without citation to any legal authority, blindly assert that "sediment" is "a pollutant in and of its own" for purposes of the federal and state claims. D.E. 41 at 9-10. Under the Clean Water Act, the term "pollutant" is inclusive of "rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water," *see* 33 U.S.C. § 1362(6).

Plaintiffs allege that "[t]he discharge of the sediment and materials to the Miami River is a violation of the Clean Water Act," D.E. 37 ¶ 32, and "[t]he nature of the material deposited in the boat basin has never been analyzed for contaminants or hazardous materials," *id.* at ¶ 37 but

"[i]t is likely that the material contains contaminants and may contain hazardous materials," *id.* "[T]he definition of pollutant in the [Clean Water] Act is broad, including among other things, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste . . ." 40 C.F.R. § 122.2 (internal quotations omitted). "When rain water flows from a site where land disturbing activities have been conducted, such as grading and clearing, it falls within" the definition of a "pollutant." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1525 n.1 (11th Cir. 1996). The allegations in the Second Amended Complaint are admittedly bare, but under the 12(b)(6) standard, the Court is to construe the well-pleaded allegations in the light most favorable to Plaintiffs and accept all reasonable inferences therefrom. In this case, the gravamen of the allegations are that "[e]ach rain event cause additional sediment to enter the storm drain system and ultimately be deposited" on their property. D.E. 37 ¶ 7. Thus, relying on the Eleventh Circuit's holding in *Hughey*, the Court believes that Plaintiffs have plausibly stated an entitlement to relief that the sedimentary deposit the County's storm water out fall pipe deposits on their property is a pollutant within the meaning of the Clean Water Act. Notwithstanding that, the Court will re-visit this issue with the benefit of a full record at a later stage.

Section 376.302 makes it unlawful: "[t]o discharge pollutants or hazardous substances" into the waters of the State if that "discharge violates any departmental 'standard' as defined in § 403.803(13)." Section 403.803(13) defines "standard" as:

> [A]ny rule of the Department of Environmental Protection relating to air and water quality, noise, solid-waste management, and electric and magnetic fields associated with electrical transmission and distribution lines and substation facilities. The term "standard" does not include rules of the department which relate exclusively to the internal management of the department, the procedural processing of applications, the administration of rulemaking or adjudicatory proceedings, the publication of notices, the conduct of hearings, or other procedural matters.

Section 376.301(36) defines "pollutants" as any "product" defined in section 377.19. "Product," in section 377.19(23) is defined as "a commodity made from oil or gas . . ." Section 376.301(21) defines "hazardous substances" as "hazardous substances in the Comprehensive Environmental Response, Compensation and Liability Act of 1980." That Act defines "hazardous substance" as:

> (A) [A]ny substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Contract Act . . . (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title . . . (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act . . . (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act . . . (E) any hazardous air pollutant listed under section 112 of the Clean Air Act . . . and (F) any immensely hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act.

42 U.S.C.A. § 9601(14). The Second Amended Complaint does not allege that the sediment discharges violate any Department of Environmental Protection rule relating to water quality. Instead, Plaintiffs allege generally that the sediment "may contain hazardous materials." D.E. 37 ¶ 17. The Court questions whether Florida's definitions of "pollutants" or "hazardous substances"—which themselves refer to the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980—are as broad as those found in the Clean Water Act. However, at this stage, the Court's obligation is to determine whether Plaintiffs have alleged a plausible entitlement to relief, not to determine whether the sediment is in fact a pollutant or a hazardous substance. Thus, Plaintiffs have met their burden of establishing a plausible entitlement to relief and the County's Motion is denied on that basis. The Court will similarly revisit this issue at a later stage with the benefit of a more robust record.

### 3. Negligence (Count V)

The County argues that Count V should be dismissed because Plaintiffs' pre-suit notice requirement was deficient. Under Florida law, a plaintiff suing a county must first present a claim in writing to the county "within three years after such claim accrues." Fla. Stat. § 768.28(6)(a). Plaintiffs attached Exhibit 3 to their Second Amended Complaint that details a "2nd Revised Notice of Violation" to Miami-Dade County dated December 22, 2017. Thus, even using 2014 as the latest that the claims accrued, Plaintiffs' pre-suit notice would be timely, because the County was notified within three years that Plaintiffs intended to file suit. Accordingly, the County's Motion is denied on that basis.

IV. **Conclusion**

Based on the foregoing, it is

**ADJUDGED** that Miami-Dade County's Motion to Dismiss **(D.E. 38)** is DENIED. It is further

**ADJUDGED** that Miami-Dade County shall file an answer to the Second Amended Complaint no later than **August 3, 2018**.

DONE AND ORDERED in Chambers at Miami, Florida, this ___ of June 2018.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record